Filed 2/22/16  P. v. Garcia CA6

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JONATHEN NATHANIEL GARCIA,<br><br>    Defendant and Appellant. | H042102<br>(Santa Clara County<br>Super. Ct. No. C1226110) |
| In re JONATHEN NATHANIEL GARCIA,<br><br>    on Habeas Corpus. | H042632 |

### INTRODUCTION

The district attorney charged defendant Jonathen Nathaniel Garcia and codefendants Bryan Chavez and Jose Luis Lemus with several counts of robbery (Pen. Code, §§ 211, 212.5, subd. (c)).[1]  Chavez and Lemus entered plea agreements; however, defendant proceeded with a jury trial.  At the conclusion of the trial, the jury convicted defendant of eight counts of robbery.  Defendant was sentenced to 19 years four months in state prison.

Defendant claims on appeal that he was denied effective assistance of counsel when trial counsel stipulated to evidence that Chavez and Lemus had pleaded no contest

---

[1] Unspecified statutory references are to the Penal Code.

to offenses arising out of the incident. Defendant also raised the same claim in a petition for a writ of habeas corpus, which this court previously ordered considered with his appeal.

**FACTUAL BACKGROUND**

### 1. Prosecution's Evidence

On February 14, 2012, around 1:30 p.m., three men entered a Wells Fargo bank located on Santa Teresa Boulevard in San Jose. At that time, there were eight employees working at the bank. The three men commanded everyone inside the bank to get down on the ground. Two of the men jumped over the teller counter, and they had bank employees unlock cash drawers and put cash into a backpack. After taking the cash, the two men jumped back over the counter, and all three men left the bank. The men took about $12,000. The robbery was caught on surveillance, and the video was played for the jury at trial.

At trial, several bank employees testified that the men wore black clothes, black shoes, and gloves. Two men wore ski masks and one of them wore a "beekeeper" hat, which covered his face. Two of the men had guns.

At the time of the robbery, Officer Michael Nasser, an off duty police officer for the San Jose Police Department, was sitting in a parking lot about 100 yards from Wells Fargo bank. Officer Nasser saw three people run into the bank. The three individuals were wearing dark clothing and something covering their faces. Officer Nasser believed that these men were going to rob the bank. The officer drove around the bank to see if he could see anything. Approximately 20 seconds later, he saw the three men run out of the bank. The officer followed the men and lost sight of them as they ran to the parking lot behind a brick wall. Fifteen seconds later, he saw a green Jeep exit the parking lot. Officer Nasser was familiar with that parking lot. He knew that it was fenced in, and he did not see anyone jumping the fences. He also did not see any other pedestrians or other cars leave the lot. Officer Nasser followed the Jeep and got a license plate number.

2

He could see only the driver from his view. He later identified the driver as Chavez. The officer was unable to follow the Jeep, but he saw the Jeep drive toward highway 101. He called the police with the license plate number.

Salinas Police Officer Juan Cruz-Gonzalez received a call about the Jeep and the license plate information. The Jeep was registered to an address on Homestead in Salinas, which was about 49 miles away from the Wells Fargo bank. Officer Cruz-Gonzalez drove to the Homestead address, arriving around 2:26 p.m. The residence was a duplex containing two apartments, "A" and "B." The officer saw that the Jeep was parked next to apartment B. About 15 to 20 minutes later, Officer Cruz-Gonzalez saw defendant, Chavez, and Lemus exit apartment B. Defendant and Lemus cradled something in their arms. The three men walked directly to the Jeep, got in the vehicle, and drove east. Officer Cruz-Gonzalez contacted the other officers in his team, informing them of what he had observed. He continued surveillance of the Homestead residence after the three men left. He saw several other people go in and out of the residence during this time. There were four other males that were associated with the Homestead residence.[2] Police officers contacted and investigated these four other males.

About one or two minutes after receiving the call from Officer Cruz-Gonzalez, officers conducted a traffic stop of the Jeep and ordered the three men out of the vehicle. The officers detained the three men and executed a search warrant of the Jeep. The officers found a black backpack behind the center console, a black sweatshirt underneath the backpack, and a black pea coat on the rear passenger seat. Inside the backpack, the officers found $3,959, a loaded Bryco .380-caliber semiautomatic gun, a green

---

[2] The four other males were: Angel Lopez, age 11; Eduardo Lopez, age 17; Angel Daniel Lopez, age 26; and Jonathan Santoyo, age 20.

sweatshirt, a green/brownish fisherman's hat, a gray cloth, gloves, and a black mask. They also found $3,845 in the upper left sleeve of the black sweatshirt.

Prior to transporting defendant to the police station, an officer searched defendant and found a cash strap in his pocket. The cash strap had "Santa Teresa" written on the side of it. Wells Fargo bank used such straps to bundle a certain amount of currency together. When the bank receives money from the cash vault, typically an employee would stamp the strap with the name of the branch location. The officers also found $255 on defendant's person.

Officers later executed a search warrant at apartment B of the Homestead residence. During the search of the downstairs bathroom, the officers found a backpack containing a loaded Walther PPK .380-caliber semiautomatic gun, two black ski masks, gloves, and $313. Near the backpack, the officers also found an identification card for Chavez, miscellaneous indicia belonging to Chavez, and a gray sweatshirt with "Ecko Unlimited" on the front of it.

San Jose Police Detective Todd Jennings conducted the investigation of the bank robbery. He arrived at Wells Fargo bank 15-20 minutes after the robbery occurred. As part of his investigation, Detective Jennings reviewed the surveillance video of the robbery. From the video stills, he identified Lemus and Chavez as the men jumping the counter. He noted that Chavez was wearing a gray sweatshirt with "Ecko Unlimited" on the front of it. He described the third suspect as wearing "gray Adidas pants with the three vertical stripes going down," a green sweatshirt, "a green/brown fishing hat," and white shoes. The third suspect also had a gun, which he held with his left hand. After defendant's arrest, Detective Jennings conducted an interview, in which defendant stated that he was left handed. Defendant also wore white shoes and gray Adidas pants with three vertical stripes at the time of the arrest. These clothes were similar to those worn by the suspect in the surveillance video.

4

### 2. *Defense Evidence*

Criminalist Tahnee Nelson Mehmet testified for the defense at trial. She examined both the Bryco and Walther PPK guns for DNA testing. Mehmet was unable to draw a conclusion on the DNA profiles from the Bryco gun due to the low level of DNA results. With respect to the Walther PPK gun, defendant's DNA was not on the trigger. The parties stipulated that there were eight fingerprints collected from the two guns. One of the prints matched Lemus, and the other prints were not identified.

### PROCEDURAL BACKGROUND

On May 23, 2013, the district attorney charged defendant, Chavez, and Lemus of nine counts of second degree robbery (§§ 211, 212.5, subd. (c)). The district attorney further alleged that defendant and Chavez personally used a firearm as to each count (§ 12022.53, subd. (b)). Prior to the commencement of trial, the trial court granted the prosecution's motion to dismiss one count of second degree robbery (count 8) as to defendant only.

The jury trial commenced on August 11, 2014. On August 20, 2014, the jury found defendant guilty as to eight counts of second degree robbery (counts 1-7, 9) and found the firearm allegation true as to all counts. On February 20, 2015, the trial court sentenced defendant to 19 years four months in state prison.

### DISCUSSION

Defendant contends on appeal that his trial counsel rendered ineffective assistance when counsel stipulated that Chavez and Lemus were convicted of participating in the robbery. He contends that the stipulation "served no reasonable tactical purpose" and that it strengthened the prosecution's case about the third robber's identity. He asserts that he was prejudiced by the stipulation as the other evidence against defendant was "far from open and shut."

5

### A. Relevant Background

On October 18, 2013, Lemus pleaded no contest to one count of second degree robbery and two counts of false imprisonment. On August 1, 2014, Chavez pleaded no contest to two counts of second degree robbery. Defendant proceeded with a jury trial.

Prior to trial, the prosecution requested in a motion in limine that the court take judicial notice of Chavez and Lemus's no contest pleas. The prosecution explained that the convictions were relevant to prove defendant's identity and involvement in the crime. The court took the matter under submission, noting that "[t]he issue of whether or not there will be a stipulation regarding the decision of the co-defendants to plead no contest in this case is still pending." Eventually, on August 15, 2014, the fifth day of trial, the parties stipulated that Chavez and Lemus were both "convicted of participating in the robbery at Santa Teresa Wells Fargo."

During closing argument, the prosecutor told the jury that this case was about the identity of the third robber. The prosecutor stated, "The other undisputed facts are that Chavez and Lemus were two of the three people who did it. Both of those men have been convicted for their participation in the Wells Fargo robbery."

The prosecutor further argued: "We know Chavez and Lemus were both convicted of that robbery. And we know that 61 minutes after the robbery happened, the getaway car was parked unoccupied, and Officer Cruz-Gonzalez watched it for 15 or 20 minutes before Chavez, Lemus, and the defendant came out of . . . Apartment B, which tells us that, for 15 to 20 minutes, the defendant was inside of [the Homestead residence] with the other two robbers so he was with them an hour after the robbery happened. And that is one brick in the wall identifying who the third robber is.

"And then you also have companionship when they get in the car so they walk straight to the car, Chavez not holding anything, [defendant] cradling something like a football, and Lemus cradling something with two hands. They all get into the same car which is another brick in the wall of identity."

Defense counsel stated in his closing argument, "We both agreed before the trial that Lemus and Chavez had been convicted of this crime. . . . [¶] The question presented by this case is, who was that third man?" Counsel argued that defendant was not identified until later when he left the Homestead residence and got into the Jeep with Chavez and Lemus. He pointed to the fact that there were many people associated with the Homestead residence and that many people were coming in and out of that house. Counsel asserted, "The fact that [defendant] . . . got into the [Jeep] doesn't prove he participated in the robbery."

## B. Ineffective Assistance of Counsel

The standard of review for a claim of ineffective assistance of counsel is well settled. "To prevail on a claim of ineffective assistance of counsel, a defendant ' "must establish not only deficient performance, i.e., representation below an objective standard of reasonableness, but also resultant prejudice." ' [Citation.] A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. (*Strickland v. Washington* (1984) 466 U.S. 668, 689.) Tactical errors are generally not deemed reversible, and counsel's decisionmaking must be evaluated in the context of the available facts. (*Id*. at p. 690.) To the extent the record on appeal fails to disclose why counsel acted or failed to act in the manner challenged, we will affirm the judgment unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266.) Moreover, prejudice must be affirmatively proved; the record must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' (*Strickland v. Washington*, *supra*, 466 U.S. at p. 694.)" (*People v. Maury* (2003) 30 Cal.4th 342, 389.)

On the appellate record before us, we are unable to definitively establish why counsel chose to stipulate to the codefendants' plea convictions, and it does not appear that counsel was ever asked for an explanation. We note that with his writ petition, defendant submitted a declaration by trial counsel, in which counsel provided an explanation for the stipulation. However, on appeal we are limited to the evidence in the record. Where the appellate record is devoid of an explanation for counsel's challenged conduct, "[a] claim of ineffective assistance . . . is more appropriately decided in a habeas corpus proceeding." (*People v. Mendoza Tello*, *supra*, 15 Cal.4th at pp. 266-267.) Accordingly, the judgment is affirmed.

## C. Petition for Writ of Habeas Corpus

In the declaration attached to the petition for writ of habeas corpus, trial counsel explained that he entered the stipulation for three reasons: (1) The prosecution had the full record of conviction for Chavez and Lemus and he "did not want [the prosecution] to present these documents as an exhibit for the jury to pour over." (2) The prosecution threatened to call Chavez to testify against defendant. Additionally, Chavez had made a statement to the police indicating that defendant was the third robber, and since Chavez was "effectively severed" from the case, counsel "did not see how [he] could keep this statement out under the *Aranda/Bruton*[3] line of cases." (3) All other testimony involved the actions of the three defendants, "so all of the facts were going to come in through one means or another."

---

3 *People v. Aranda* (1965) 63 Cal.2d 518; *Bruton v. United States* (1968) 391 U.S. 123. " 'The *Aranda/Bruton* rule addresses the situation in which "an out-of-court confession of one defendant . . . incriminates not only that defendant but another defendant *jointly charged*." [Citation.] "The United States Supreme Court has held that, because jurors cannot be expected to ignore one defendant's confession that is 'powerfully incriminating' as to a second defendant when determining the latter's guilt, admission of such a confession *at a joint trial* generally violates the confrontation rights of the nondeclarant." ' " (*People v. Combs* (2004) 34 Cal.4th 821, 841.)

8

We acknowledge that generally, evidence of a codefendant's guilty plea or conviction is not admissible to prove guilt of a defendant. (*People v. Neely* (2009) 176 Cal.App.4th 787, 795.) Nonetheless, "[t]here is no question that a defendant may stipulate to the introduction of evidence to which he might have objected and which might otherwise be inadmissible." (*People v. Torres* (1962) 201 Cal.App.2d 290, 295.)

In this case, counsel was clearly concerned about the risk that other, possibly more incriminating, evidence relating to the codefendants would be presented at trial. Specifically, counsel was concerned that Chavez would testify against defendant and that prior statements implicating defendant would be admitted into evidence. Defendant, however, argues that counsel's fear was unfounded because Chavez was unavailable as a witness to testify, since he had not been sentenced at the time of defendant's trial and would thus retain his Fifth Amendment privilege against self-incrimination. (*People v. Fonseca* (1995) 36 Cal.App.4th 631, 635.)

Regardless of whether Chavez had a Fifth Amendment privilege against self-incrimination, nothing in the record shows that he would have invoked such a privilege at defendant's trial. In our view, there was a reasonable possibility that Chavez would have testified against defendant, especially if he was offered a benefit from the prosecution. Furthermore, as defendant was tried separately from his codefendants, counsel acted reasonably in order to avoid the possibility of Chavez's incriminating statements being admitted into evidence. (See *People v. Combs*, *supra*, 34 Cal.4th at p. 841 [concluding that the *Aranda/Bruton* rule does not apply where the defendant was separately tried from his or her codefendant].) Given these concerns, counsel had valid reasons to opt for the stipulation rather than run the risk of the jury hearing evidence that would have gone beyond the mere plea convictions of the codefendants.

Even if we conclude that trial counsel's performance was deficient in stipulating to the plea convictions, defendant cannot prove prejudice. Notwithstanding the stipulation, the evidence substantiated Chavez and Lemus's participation in the robbery.

9

Specifically, Officer Nasser had testified that he saw Chavez as the getaway driver; Chavez's driver's license was near the backpack containing the two guns; Lemus's fingerprints were found on one of the guns; and Detective Jennings had identified them as the two men who jumped over the bank counter during the robbery. In light of this evidence, the stipulation did not likely change the outcome of defendant's case. Furthermore, the stipulation did not detract from defendant's theory of the case that he was one of the many people associated with the Homestead residence and that he was merely at the residence with the two codefendants at the wrong time. Therefore, as defendant has not shown a "reasonable probability" that counsel's stipulation would have made a difference in the jury's verdict, we reject defendant's ineffective assistance of counsel claim. (*Strickland v. Washington*, *supra*, 466 U.S. at p. 694.)

**DISPOSITION**

The judgment is affirmed. The petition for a writ of habeas corpus is denied.

_____

Premo, Acting P.J.

WE CONCUR:


_____

Elia, J.


_____

Grover, J.